[819 NYS2d 499]

STATE OF NEW YORK ex rel. STEPHEN J. HARKAVY, on Behalf of JOHN DOES Nos. 13 through 22, Respondent-Appellant, v EILEEN CONSILVIO, as Executive Director of Manhattan Psychiatric Center and Kirby Forensic Psychiatric Center, Appellant-Respondent.

First Department, July 27, 2006

APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney General*, New York City (*Julie Lough-ran* and *Daniel Smirlock* of counsel), for appellant-respondent.

*Marvin Bernstein, Mental Hygiene Legal Service*, New York City (*Diane Goldstein Temkin* and *Karen G. Andreasian* of counsel), for respondent-appellant.

**OPINION OF THE COURT**

CATTERSON, J.

This is an appeal by respondent-appellant, Eileen Consilvio, Executive Director, Manhattan Psychiatric Center and Kirby Forensic Psychiatric Center, from an order and judgment (one paper) which partially granted a habeas corpus petition insofar as to order the conditional release of the petitioners, eight former inmates who were transferred from various prisons to the Kirby Forensic Psychiatric Center after completing prison terms for sexually violent offenses.

The petitioners, Stephen Harkavy on behalf of John Does 13 through 22, cross-appeal from the part of the same order which found that a court cannot order the release of a person from psychiatric care without a substantive review of that person's

mental state, and that the petitioners could be confined to a secure facility pending such hearing. Stephen J. Harkavy, Deputy Director of the Mental Hygiene Legal Service (hereinafter referred to as MHLS), further seeks the release of the petitioners.

For the reasons that follow, the order granting the petition insofar as it ordered immediate hearings for each petitioner or release of the petitioners is vacated and the petition dismissed.

In this proceeding pursuant to CPLR article 70 (hereinafter referred to as the habeas corpus proceeding or *Harkavy II*), the petitioners maintained that they were transferred by the Department of Corrections at the conclusion of their prison terms to the custody of the Office of Mental Health (hereinafter referred to as OMH), as a means of preventing their release.

The petitioners argued in their December 22, 2005 petition that their detentions were illegal because they were not accorded the benefit of the procedures mandated by Correction Law § 402, which are to be followed before a prisoner is compelled to undergo a psychiatric evaluation. The petitioners asserted that section 402 provides specific procedural protections, including notice to a prisoner and an opportunity to be heard, before a prisoner is transferred into the custody of OMH.

The petitioners also argued that the medical certifications upon which their detentions were based were invalid because they failed to allege facts supporting the need for either nonsecure or secure hospitalization under Mental Hygiene Law § 9.27 (a). The petitioners further argued that they were deprived of substantive and procedural due process and equal protection by being transferred from prison directly to Kirby, a secure psychiatric facility, because there is no authority in the Mental Hygiene Law to commit a civil patient to Kirby, and that in the instant case there are no facts to support the need for secure retention (i.e., that a patient's illness cannot be managed adequately in a nonsecure setting). According to the petitioners, the State is bound by procedures mandated in the Correction Law, which comply with the due process protections laid out in *Vitek v Jones* (445 US 480 [1980]), including notice of the intended transfer and an opportunity for a hearing before an independent decision maker.

In an order and judgment (one paper) entered February 10, 2006, the court sustained the writ of habeas corpus and directed the respondent to produce the petitioners for individual hear-

ings on the issue of the petitioners' alleged need for continued psychiatric hospitalization.[1]

On March 30, 2006, this Court in *State of N.Y. ex rel. Harkavy v Consilvio* (29 AD3d 221 [2006]) unanimously reversed the November 15, 2005 order and judgment in *Harkavy I*, vacated the order for conditional release and dismissed the petition. In that case, the IAS court held that Correction Law § 402 (which applies to mentally ill prisoners) governed the petitioners' commitments. This Court found that the rationale was inconsistent with the statute's plain meaning and legislative intent, and that instead Mental Hygiene Law article 9 (which applies to the general public) applied to the *Harkavy I* petitioners, who were not prisoners at the time of their commitments. Thus, this Court reasoned that respondent Consilvio properly proceeded pursuant to the Mental Hygiene Law in committing the *Harkavy I* petitioners for involuntary psychiatric hospitalization after they had completed their prison terms. (*Id.* at 222-223, 226.) We also found the petitioners' alternative argument, that the procedures under Mental Hygiene Law article 9 deprived them of due process rights under the Fourteenth Amendment, to be baseless because *Vitek v Jones* (*supra*) was distinguishable since the petitioners were not prisoners at the time of their commitment. (29 AD3d at 227.) Finally, we determined that the petitioners erred in commencing the *Harkavy I* habeas corpus proceeding pursuant to CPLR article 70. The remedy available to the petitioners was a proceeding pursuant to Mental Hygiene Law § 33.15, which requires a court to examine not only the legality of the individual's detention but also the facts concerning the person's alleged mental disability. (29 AD3d at 228.)

The *Harkavy II* petitioners here are situated identically to their *Harkavy I* counterparts with respect to the application of

---

1. The court noted that at the time of its February 10, 2006 order and judgment, this case involved Harkavy's second application to the IAS court for the release of former inmates allegedly transferred improperly from prison to a psychiatric facility. In *State of N.Y. ex rel. Harkavy v Consilvio* (10 Misc 3d 851 [Sup Ct, NY County 2005] [hereinafter referred to as *Harkavy I*]), the same court, in an order and judgment entered on or about November 15, 2005, determined that the transfer of former inmates to Manhattan Psychiatric Center, a nonsecure psychiatric facility, pursuant to Mental Hygiene Law § 9.27 (a), was improper, and granted the habeas corpus petition insofar as to order the conditional release of the petitioners unless two independent, court-appointed physicians certified that these petitioners were in need of care and treatment in a psychiatric facility. At the time of the February 10th order and judgment in *Harkavy II*, *Harkavy I* had been appealed and was awaiting decision by this Court.

Mental Hygiene Law article 9. Immediately prior to their commitment, each of the petitioners was in the custody of the Department of Correctional Services; each was a felony sex offender about to be released from prison when two OMH physicians certified the need for commitment pursuant to Mental Hygiene Law § 9.27. Each certification was based upon a medical determination that the individual petitioner had a mental illness, was in need of inpatient care and treatment, and presented a substantial threat of harm to himself or others. A few days before each petitioner was to be released, the superintendents of the respective correctional facilities completed applications for involuntary commitment to a psychiatric hospital pursuant to Mental Hygiene Law § 9.27. Upon the expiration of their sentences, each petitioner was transported to an OHM facility where, as any other civilian would be, he was examined by a third OMH physician who confirmed what the two physicians had previously certified and found a need for commitment. It was only then that each petitioner was committed to the respondent's care and custody.

■ Since the *Harkavy II* petitioners' statutory or constitutional rights did not differ in any way from those of the *Harkavy I* petitioners, this Court's decision in *Harkavy I* controls this appeal, and that part of the IAS court's determination that the petitioners' due process rights were violated when they were committed to Kirby pursuant to Mental Hygiene Law article 9 should be vacated.

In *Harkavy I*, we held that the prison superintendents were authorized to apply for the petitioners' postrelease civil commitment. The Department of Correctional Services, as a public agency in whose custody the petitioners resided, has standing to make the applications pursuant to the language of Mental Hygiene Law § 9.27 (b) (4), which authorizes any officer of a public institution, public agency or public home to execute an application for the involuntary commitment of an individual in his care or custody. Because the prison superintendents satisfy this criterion, they are authorized to apply for the commitment of the petitioners in the instant case, just as this Court held in *Harkavy I*. Thus, the IAS court's determination that the retention of the petitioners was inappropriate because a prison superintendent is not an appropriate applicant for the involuntary admission of a person pursuant to section 9.27 of the Mental Hygiene Law should also be vacated.

The petitioners maintain on their cross appeal that they have a substantive due process right to be assured that the nature of

their commitment at Kirby bears a reasonable relationship to its purpose, and that this right was violated here because the State failed to provide any criteria for secure psychiatric commitment.

The petitioners argue that their liberty interest in not being confined in a secure hospital was violated by their commitment to Kirby, absent any statutory authority upon which to commit them to such a secure facility.[2] The petitioners also argue that there was no exercise of professional medical judgment that determined they required secure commitment. (*See Kansas v Crane*, 534 US 407, 412-413 [2002].) Rather, they argue, they were designated by OMH for commitment to Kirby "merely at the Governor's request." Therefore, they assert that the court's decision should be vacated "insomuch that it held that there was no constitutional violation by committing petitioners directly to Kirby and that MHL 33.15 is the only habeas writ available to petitioner." They claim that they should be released, or alternatively, be given a hearing on whether they should be committed to a nonsecure hospital.

Contrary to the petitioners' argument that there was a lack of statutory authority for civil commitments to a secure facility, each petitioner was admitted to Kirby pursuant to Mental Hygiene Law § 9.27. That statute permits the director of the hospital where a person is brought to admit such person as a patient upon an application, two physician certificates, and a staff psychiatrist's examination, all confirming the need for involuntary care and treatment. The Mental Hygiene Law makes no distinction between secure and nonsecure facilities for purposes of Mental Hygiene Law article 9 commitments because it applies to all "hospitals." The statutory list includes both secure and nonsecure facilities. (*See* Mental Hygiene Law § 7.17 [b]; § 9.27 [a], [e].) Thus, the respondent, as Executive Director of both Manhattan Psychiatric Center, a nonsecure facility, and Kirby Forensic Psychiatric Center, a secure facility, has the authority to admit a patient to either facility. Both are listed as hospitals under section 7.17 (b) of the Mental Hygiene Law that provide for the care, treatment and rehabilitation of the mentally disabled.

The petitioners also argue that they were committed without the requisite "lack of control" determination for committing

---

**2.** The petitioners maintain that Mental Hygiene Law § 9.27 contains the standard for nonsecure commitment only.

sexually violent predators as set forth in *Kansas v Crane* (534 US at 412-413). However, *Crane* addressed the constitutionality of a Kansas law that permitted civil commitment of sexual predators under a new standard that focused on whether a person had a mental abnormality that made him likely to commit sexual offenses. The Supreme Court held that in order to find such a statute constitutional and permit commitment, there had to be a showing that an individual suffering from a mental abnormality was unable, as a result of that abnormality, to control his actions. (*Id.*)

This "lack of control" element and the holding of *Crane* are irrelevant to the instant petition because the petitioners were not committed pursuant to a "mental abnormality" standard, but rather were committed pursuant to Mental Hygiene Law article 9, and were subject to the same civil involuntary commitment standards as any other individual in the state; standards that have previously been deemed to satisfy minimum substantive due process requirements. (*See Matter of K.L.*, 1 NY3d 362, 371 [2004]; *Project Release v Prevost*, 722 F2d 960, 971-975 [2d Cir 1983].)

Lastly, the petitioners argue that they were denied substantive due process rights based upon the purported lack of professional judgment underlying their commitments to Kirby (which purportedly affects their liberty interest in nonsecure as opposed to secure retention, and in being stigmatized as sexually violent predators). When a statute affects a fundamental interest (i.e., personal rights protected by the Constitution), it is subject to strict scrutiny and will be sustained only if the statute is suitably tailored to serve a compelling state interest. (*See Cleburne v Cleburne Living Center, Inc.*, 473 US 432, 440 [1985]; *Alevy v Downstate Med. Ctr. of State of N.Y.*, 39 NY2d 326, 332 [1976].) However, where no fundamental interest is at stake, substantive due process concerns are satisfied so long as legislation is rationally related to a legitimate state interest. (*See Romer v Evans*, 517 US 620, 633 [1996]; *Alevy v Downstate Med. Ctr. of State of N.Y., supra.*)

Here, the petitioners, on their cross appeal, fail to demonstrate that there is a fundamental interest concerning the type of institution in which they are to be confined. The petitioners do not contend that Mental Hygiene Law article 9 commitment standards are not sufficiently tailored to ensure them substantive due process with respect to the threshold commitment question, which resulted in the deprivation of their liberty. Nor could

they, given that New York's civil commitment standards have been upheld against due process challenges. (*See Matter of K.L., supra*; *Project Release v Prevost, supra*.) Instead, the petitioners claim that they are entitled to be placed in a particular type of hospital. This clearly does not implicate any fundamental interest. (*See e.g., Matter of Jamie R. v Consilvio*, 17 AD3d 52, 59 [1st Dept 2005], *affd* 6 NY3d 138 [2006] [once the initial question of deprivation of liberty—forced hospitalization—has been determined by the jury, the type of confinement—secure or nonsecure—is for the court]; *Bernstein v Pataki*, 409 F Supp 2d 306, 310 [SD NY 2005] ["(j)ust as a (criminal) conviction extinguishes a prisoner's right to be housed in a less-secure prison, civil commitment extinguishes a patient's liberty interest in being housed in a less-secure psychiatric facility"].)

Since the petitioners failed to allege the infringement of a fundamental interest, their direct-to-Kirby commitments have to satisfy only rational basis review to withstand a substantive due process challenge. By permitting commitment under Mental Hygiene Law article 9 standards to a hospital as listed in the statute, the Legislature has recognized that decisions regarding placement and treatment are best left to administrators and medical professionals. (*See Mental Hygiene Legal Servs. v Ford*, 92 NY2d 500, 508, 509 [1998] [while the decision to transfer a patient from a nonsecure facility to a secure facility "is primarily one of professional medical judgment as to the most appropriate therapeutic setting," in the case of a violent mentally ill patient, "security concerns are inextricably linked to considerations of professional medical treatment" and "it is not the province of the courts to weigh the degrees of medical and security considerations which may go into any individual transfer decision"]; *Matter of Jerome G.*, 201 AD2d 562, 563 [2d Dept 1994] [once a decision to retain a patient has been made by a court, the decision as to which facility is appropriate is left to the discretion of the Commissioner of the New York State Office of Mental Health, subject to a patient's right to appeal the proposed transfer pursuant to 14 NYCRR 517.4 (c) (3) and CPLR article 78].)

In order to state a substantive due process claim for breach of the State's duty to provide basic necessities such as medical care and treatment to involuntarily committed individuals, a petitioner must allege that a decision by a professional administrator was a substantial departure from accepted professional judgment or standards, showing that the person respon-

sible did not base the decision on such a judgment. (*See Youngberg v Romeo*, 457 US 307, 324-325 [1982].)

Here, the petitioners' direct-to-Kirby commitments resulted from consideration by medical, security and administrative personnel. The Associate Commissioner for the Division of Forensic Services within the Office of Mental Health, the official charged with administrative supervision at Kirby, determined that the petitioners would be most appropriately treated at secure facilities such as Kirby. This determination was "[b]ased upon knowledge gained through experience, literature research and consultation with experts in the field and colleagues in states that have civil commitment statutes for sex offenders." The Associate Commissioner explained that a secure facility provides a range and variety of therapeutic programs and clinical services and is staffed with personnel who have been adequately trained in security methods so that the risk of danger and escapes is minimized. The petitioners qualified as patients in need of care and treatment at a secure facility because they had been imprisoned for sexually violent offenses. They were certified by two committing psychiatrists as presenting a high risk of reoffending. A third psychiatrist confirmed the petitioners' need for involuntary care and treatment, that the predatory nature of their mental illness affected their emotional or volitional capacity in a manner that predisposed them to the commission of sexually violent offenses, and that they are a menace to the health or safety of other vulnerable patients and staff.

The articulated security concerns and the attempt to provide a setting conducive to treatment certainly have a rational basis, and, therefore, the petitioners did not suffer a violation of their substantive due process rights when they were admitted to a secure facility.

The petitioners next contend that their rights under the Equal Protection Clause as compared to other civil patients transferred to Kirby from nonsecure facilities, were violated by being committed directly to Kirby without any admissions criteria, reviewing standard, individualized psychiatric assessment or opportunity to object. According to the petitioners, there is no rational basis for providing substantive and procedural safeguards to civil patients transferred from nonsecure hospitals to secure hospitals but in failing to provide them for civil patients that are admitted directly to a secure hospital.

■ Under an equal protection analysis, unless a suspect class (i.e. a classification by race, alienage or national origin) is at is-

sue, the classification must be rationally related to a legitimate state purpose. (*See People v Parker*, 41 NY2d 21, 25 [1976]; *Alevy v Downstate Med. Ctr. of State of N.Y.*, 39 NY2d at 332.) Rational basis review has been applied to an equal protection challenge arising out of differential treatment of insanity acquittees committed to secure facilities pursuant to Criminal Procedure Law § 330.20 and involuntary committees transferred administratively to secure facilities. (*See Mental Hygiene Legal Servs. v Ford*, 92 NY2d at 510.) Since the petitioners are not members of a suspect class, rational basis review applies to their equal protection challenge.

Contrary to the IAS court's determination, the petitioners could not challenge their secure confinement by utilizing 14 NYCRR part 57 because they were never confined in a nonsecure facility. As such, they are treated somewhat differently from patients who are initially committed to nonsecure facilities and then transferred to secure facilities. However, the difference is minimal, and the petitioners still have an opportunity to challenge their secure commitments under 14 NYCRR part 517. (*See Matter of Consilvio v Michael B.*, 307 AD2d 852, 853 [1st Dept 2003], *lv denied* 2 NY3d 701 [2004] ["14 NYCRR part 517 does apply in pertinent part to a transfer of a patient from a secure facility to a nonsecure facility"] .) In addition to obtaining administrative review by applying for a transfer to a nonsecure facility under 14 NYCRR part 517, the petitioners can obtain expeditious judicial review of such administrative proceedings under CPLR article 78. (*Id.*) In *Michael B.*, we held that part 517 did not deny patients committed directly to secure facilities equal protection by denying them judicial hearings available to insanity acquittees who were committed to secure facilities pursuant to Criminal Procedure Law § 330.20. (*Michael B.*, 307 AD2d at 854.)

It is clear that there is little difference between patients subject to part 57 and patients subject to part 517; viz., part 517 lacks specific substantive criteria that must be met in order to retain an individual in a secure facility. However, the classification of the petitioners and their assignment directly to Kirby is rational, based upon the reasons articulated by the Associate Commissioner, set forth above. Furthermore, the availability of part 517 and CPLR article 78 to the petitioners ensures that any arbitrary or capricious administrative ruling

may be challenged expeditiously, thus guaranteeing the petitioners the equal protection to which they are entitled.[3]

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Jacqueline W. Silbermann, J.), entered February 10, 2006, which granted the petition insofar as it ordered immediate hearings for each petitioner or release of the petitioners, should be reversed, on the law, without costs, the order and judgment (one paper) vacated and the petition dismissed.

TOM, J.P., FRIEDMAN, SULLIVAN and MALONE, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered February 10, 2006, reversed, on the law, without costs, the order and judgment (one paper) vacated and the petition dismissed.

---

3. It should be noted that petitioners' argument, that OMH created an illegal mechanism for the secure commitment of petitioners in violation of the State Administrative Procedure Act and the separation of powers doctrine, was not mentioned in the petition or affirmation in support, but rather was raised for the first time in their reply to the respondent's return, thus giving respondent no opportunity to respond to these arguments in the IAS court. Even if the State Administrative Procedure Act and separation of powers arguments were properly before the IAS court, they are meritless.

In support of the State Administrative Procedure Act claim, petitioners allege that a September 14, 2005 memorandum from OMH to various Department of Correctional Services (DOCS) personnel regarding the civil commitment of inmate-patients with mental illness constituted a rule that had a definite legal effect, and therefore, it had to be promulgated pursuant to the State Administrative Procedure Act. However, the memorandum clearly advises that any commitments under the policy are to be based on the well-established guidelines and standards of the Mental Hygiene Law. Since the memorandum in no way alters New York's civil commitment standards or the procedural protections available to committees, and since it merely offers OMH and DOCS staff guidance with respect to evaluations and treatment, the State Administrative Procedure Act does not apply here. (*See* State Administrative Procedure Act § 102 [2] [b] [i], [iv].)

In support of their separation of powers argument, petitioners rely on the case of *Boreali v Axelrod* (71 NY2d 1 [1987]), in which the Court of Appeals struck down, on separation of powers grounds, regulations on smoking issued by the Public Health Council because in issuing the regulations, the Council had usurped the authority of the Legislature. *Boreali* is distinguishable because here the September 14, 2005 memorandum did not issue guidelines affecting the public as did the Council's regulations in *Boreali*. Rather, the subject memorandum gave direction and advice to OMH and DOCS staff based upon judicial interpretations of the current law governing civil commitments. Such direction did not require legislative authorization.